UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROY A. SLAY,                          :
              Plaintiff,              :
                                      :
     v.                               :          CA 10-408 ML
                                      :
BANK OF AMERICA CORPORATION,[1]       :
              Defendant.              :


**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

     Before the Court is Defendant's Motion to Dismiss
Plaintiff's Complaint (Docket ("Dkt.") #4) ("Motion to Dismiss"
or "Motion").  Defendant Bank of America Corporation ("Defendant"
or "BOA") contends that none of the claims alleged in Plaintiff's
Complaint state a valid cause of action and that, therefore, it
must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for
failure to state a claim upon which relief can be granted.  The
Motion has been referred to me pursuant to 28 U.S.C. §
636(b)(1)(B) for preliminary review, findings, and recommended
disposition.  After reviewing the filings, listening to the
recorded oral argument, and performing independent research, I
recommend that the Motion be granted.

_____

     [1] Defendant Bank of America, N.A. ("Defendant" or "BOA"), states
that it is improperly named in the Complaint as Bank America
Corporation.  See Memorandum in Support of Defendant's Motion to
Dismiss Plaintiff's Complaint ("Defendant's Mem.") at 1.

## I. Synopsis of Complaint

Reading his pro se Complaint generously, Plaintiff Roy A. Slay ("Plaintiff" or "Slay") alleges that his former employer, BOA, retaliated and defamed him after he reported to governmental authorities what he believed to be a violation of law by BOA. See Complaint (Dkt. #1). Slay appears to allege that the retaliation consisted of the following actions: having his fellow employees "spy" on him, id. at 2; sending emails seeking personal information about him, id.; keeping him in the same work space while other employees were moved around, id.; moving employees, who were reporting back to management, closer to him, id.; terminating his employment on March 9, 2010, id.; and subsequently reporting to the Rhode Island Department of Labor and Training ("DLT") that he had been "discharged for dishonesty," Notice of Response to Claim ("Notice of Response").[2] The defamation claim appears to be based on the report which BOA

---

[2] In addition to his Complaint, Slay filed approximately fifty pages of documents, some of which are specifically referenced in that pleading. In resolving the instant Motion, the Court has considered the Complaint and "'facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice.'" Rederford v. US Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009)(quoting Jorge v. Rumsfeld, 404 F.3d 556, 559 (1st Cir. 2005)); see also Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) ("When ruling on a Rule 12(b)(6) motion to dismiss, a district court is generally limited to considering facts and documents that are part of or incorporated into the complaint. These limitations, however, are not absolute. A district court may also consider documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.")(alteration in original)(internal citations and quotation marks omitted).

made to the DLT and also on Slay's allegation that "[m]anagement made false accusations that I threaten[ed] a manager (Marylou Gervasio) and the quality assurance coach (Will Torres)."[3] Complaint at 1.

Slay further alleges that eighteen past or present employees of BOA conspired to have him fired. Id. He also claims that "[m]anagement and fellow associates at Bank of America," id. at 3, violated his rights under the First, Fourth, Fifth, and Ninth Amendments to the United States Constitution, id.

In a possibly unrelated claim, Slay alleges that after he was hired management sent him an email which requested that he "complete a new hire questionnaire."[4] Complaint at 2. Slay alleges that some of the questions were of a personal nature and

---

[3] The Complaint does not state what act(s) or statement(s) by BOA constitute the alleged defamation. See Complaint. Accordingly, the Court gives Slay the benefit of the doubt by inferring that his defamation claim appears to be based on the report made to the Rhode Island Department of Labor and Training ("DLT") by BOA. The Court does the same with respect to his allegation that "[m]anagement made false accusations that I threaten[ed] a manager (Marylou Gervasio) and the quality assurance coach (Will Torres)," Complaint at 1, because Slay does not link this statement to his defamation claim. The Court assumes that the statement is connected to Slay's defamation claim because of its reference to "false accusations." Id. at 1.

[4] It is unclear whether Slay alleges that the email which asked him to complete the "new hire questionnaire," Complaint at 2, was among, or separate from, the emails which he claims management sent to him as part of the conspiracy to turn his "work environment into a hostile work environment ...," id. at 2. For purposes of this Report and Recommendation, the Court treats this claim as if it is unrelated to his hostile work environment and conspiracy claims. However, even if the claim based on the new hire questionnaire is related to the other claims, the Court's conclusion with respect to the resolution of the instant Motion would be the same.

that one, which inquired about "sexual orientation preference[,] Heterosexual or Homosexual," id., violated state law, id.

As damages, he seeks twenty-five million dollars "for defamation of my character, destitute, anxiety, fearful, sleeplessness, manipulation, hassle, intimidation, conspiracy, court cost ...," id. at 3, and the aforementioned violation of his constitutional rights, see id. He states that he lost his "income, pension, health benefits and most important, self."[5] Id.

## II. Facts[6]

Slay was employed as a customer service representative in a call center within BOA known as the Order to Pay Call Center. On August 25, 2009, Edna Coleman ("Coleman"), then the manager of the department, sent an email to Slay and other employees which stated:

Good afternoon team,

Can you please provide me your computer name by EOD on 08/26. Please see attached instructions. If you could please copy and paste your computer name into an email back to me.

---

[5] In the Complaint, this sentence ends with the word "self." Complaint at 3.

[6] The facts are taken from the allegations in Slay's pro se Complaint which for purposes of the instant Motion are assumed to be true. See Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 13 (1st Cir. 2009)(stating that where question is dismissal pursuant to Fed. R. Civ. P. 12(b)(6), the court "assume[s] the truth of all well-pleaded facts in the complaint and indulge[s] all reasonable inferences that fit the plaintiff's stated theory of liability") (internal quotation marks omitted).

Reason: to remove Inova Solutions from your desktop.

Christine/Annmarie/Pete: can you please assist anyone
who may need assistance following these instructions.

Thanks,
Edna

Email from Coleman to DG Procurement Ops of 8/25/09 ("Coleman's
Email")(bold omitted).  Slay alleges that on August 26, 2009, the
day he and the other employees were to email their computer name
to Coleman, she worked from home.  See Roy Slay Bank of America
Timeline ("Timeline") at 1.

On September 28, 2009, Slay sent a letter to the president
of BOA, Kenneth Lewis, regarding an "Information Security
Breach."  Letter from Slay to Lewis of 9/28/09.  The letter
included a copy of Coleman's Email and stated in part:

> My department (The Order to Pay Call Center) was made
> aware that Mrs. Coleman was taking an early retirement
> that will start in November 2009.  The day the computer
> name was due, Mrs. Coleman worked from home.  I did not
> provide my computer name, knowing that this was a serious
> policy violation and that Mrs. Coleman was not acting
> alone.
>
> Some of the associates involved are: David K. Anderson
> (VP; Group Operation Manager Client Services [a]nd
> Support Admin.).  Jamie Alberico (Analyst 1-Data
> Mining/Whse System Admin/Reporting).
>
> Accounts Payable has a high associate turnover rate and
> HR hasn't been able to determine why.  I know why and
> will share that and other information about the culture
> here that David K. Anderson has foster[ed] here.  Mr.
> Anderson helped get Keith R. Jacobson (SVP; SR Finance
> MGR Client Services [a]nd Support Admin.) his position,
> so Keith Jacobson is in Mr. Anderson['s] sphere of
> influence as are those that report to Mr. Anderson [a]nd
> Mr. Jacobson.  Mr. Jacobson has been conveniently out on

5

> vacation planing [h]is wedding during this Information
> Security Breach since the email went out.

<u>Id.</u>  The letter concludes with Slay asking Lewis for his

"counsel."  <u>Id.</u>

Lewis did not respond to the letter, and on or about

November 11, 2009,[7] Slay wrote to the Rhode Island Department of

Business Regulation Division of Banking ("DBR-DB") regarding his

"concern that there is a serious customer information security

breach at Bank of America."  Letter from Slay to DBR-DB of

11/11/09.[8]  He enclosed a copy of his letter to Lewis and

related in part that:

> [T]his situation has cause[d] me a lot of anxiety and
> sleepless nights.  I now work in a hostile environment.
> One of the managers in my department, Peter Connell[,]
> made that point clear by reciting my home address and
> phone number. Another manager, John Cuddy[,] I overheard
> make a remark to my department manager[,] David
> Anderson[,] when he saw me at my desk, "You didn't get
> rid of that!"
>
> This is a serious matter[,] and I need to be deem[ed] a
> Whistle Blower so I am protected from retaliation by Dave
> K. Anderson and Keith Jacobson and their management team,

---

[7] In the Complaint, Slay states that his letter to the Rhode
Island Department of Business Regulation Division of Banking ("DBR-
DB") was dated November 10, 2009.  <u>See</u> Complaint at 2.  However, the
letter itself is dated November 11, 2009.  <u>See</u> Letter from Slay to
DBR-DB of 11/11/09.  DBR-DB, in acknowledging receipt of Slay's
missive, refers to "your complaint dated November 12, 2009 ...."
Letter from Cayouette to Slay of 11/18/09.  In citing to the Letter
from Slay to DBR-DB of 11/11/09, the Court refers to the letter
bearing that date.

[8] The letter to DBR-DB does not reflect the addressee.  The Court
assumes that DBR-DB is the addressee from the content of the letter
and Slay's reference to it in the Complaint.  <u>See</u> Letter from Slay to
DBR-DB of 11/11/09; Complaint at 2.

Human Resources[,] and others at Bank of America.

I want a full investigation by State and Federal
Officials.  I want David K. Anderson, Keith R.
Jacobson[,] and their management team replaced.  David K.
Anderson, Keith R. Jacobson, Edna Coleman, Jamie
Alberico, Peter Connell[,] and Will Torres terminated.
I want my job protected and Whistle Blower status.
Information on my computer was accessed when I was out of
the office on vacation[,] and I want to know who accessed
it and what was accessed.

Letter from Slay to DBR-DB of 11/11/09.

The DBR-DB acknowledged Slay's letter, advised him that BOA
was not regulated by it, and stated that it had forwarded his
complaint "to the Comptroller of the Currency, which is the
agency responsible for the supervision[] and regulation of
[BOA]."  Letter from Cayouette to Slay of 11/18/09.  The letter
directed Slay to address all future inquiries to the Comptroller
of the Currency, Customer Assistance Group.  Id.

Slay sent a letter to the Comptroller of the Currency on
November 23, 2009, recounting his letters to Lewis and DBR-DB.
Letter from Slay to Comptroller of Currency of 11/23/09.  Slay
also stated that someone at the "Department of Business
Regulation contacted Keith R. Jacobson[,] the Senior Vice
President[,] ... and provided him with my complaint information."
Id.  Slay's letter concluded with the following paragraph:

Please see all the enclosed letters and documentation
regarding this matter.  Action needs to be taken quickly
and I don't know how much longer I'm going to be employed
with Bank of America.  Keith R. Jacobson has informed his
management team of my letter requesting a full
investigation and that he and his management team should

be terminated. My[] immediate manager[,] Annmarie Dirocco[,] made a comment, "I better stay away from you."

Id.

On February 22, 2010, David Anderson ("Anderson"), the call center director, called an impromptu departmental meeting and announced that Peter Connell had been terminated. Timeline at 2. Anderson stated that he was "not going to go into why." Id.

On March 3, 2010, Slay spent 54 minutes on the phone with a caller who was having a problem getting invoices paid. Complaint at 1; Timeline at 2. Near the end of the call, Slay told the caller that he "needed to wrap the call up, 'they (management) want[] our calls to average around 7 minutes.'"[9] Timeline at 2. Shortly after completing the call, which had been monitored by Will Torres ("Torres"), the quality assurance coach, Slay received an instant message from his new manager, Randel George[10] ("George"):

> please do not inform callers of our SLA's (Service Level Agreement), it is unprofessional, 7 minutes per call is the overall average, I would expect a call to be as long as it needs to be.

Id. at 2. Slay saved this message, printed it, and gave it to Annmarie Dirocco ("Dirocco") who had instructed Slay to let her

---

[9] In reproducing this and other conversations which Slay quotes in his filings, the Court has made minor changes in capitalization and punctuation to facilitate comprehension. See Roy Slay Bank of America Timeline ("Timeline") at 3. To avoid distraction, these changes have been made without signal.

[10] George's first name appears in the record both as "Randel," Timeline at 2, and "Randall," DLT Form at 1.

know first when he had a problem with something.  Id.  Dirocco
gave the message to George, and George told Slay that he wanted
to meet with him.  Id.

Shortly after noon, George met with Slay.  Id.  During this
meeting, George asked Slay why he was "so combative," id., and
whether he would be willing to serve on the associate
satisfaction team which George was forming, id.  Slay responded
that their "last meeting involve[d] me being beaten up by you,
Peter Connell and Will Torres.  Every time I try to point out a
problem, I'm made out to the bad guy.  As for being on the
associate satisfaction team, no thank you, that ship has sailed."
Id.  George replied, "Please, ok, think about it."  Id.  The
meeting continued for another twenty minutes before concluding
around 12:42 p.m., "just as the ½ hour lunch break started."  Id.
Slay believed the meeting "was a fishing expedition," id., to
obtain information about him, id.

Around 1:07 p.m., Slay was eating at his desk as was his
practice.  Id.  Torres, who was standing behind the associate
across from Slay, yelled over to Slay, "What's going on Roy?"
Id.  Slay yelled back, "We got a problem."  Id.  Torres
responded, "What's the problem?"  Id.  Slay answered, "You and
these calls!"  Timeline at 2-3.  Torres told Slay to "then
schedule a meeting," id. at 3, and Slay replied, "I will, you see
where that has gotten me," id.

9

At 1:20 p.m., George told Slay to log off his phone because
they "need[ed] to talk."  Id.  Slay proceeded to do so and then
went to find George.  He located George with Anderson in
Anderson's office.  Id.  Slay took a seat at a small table facing
George and the following conversation ensued:

> GEORGE:  Roy, the reason for the meeting is we just got
>          some disturbing news.  Will Torres said you
>          threaten[ed] him.
>
> SLAY:    Threaten him?
>
> GEORGE:  You said to him we've got a problem.
>
> SLAY:    Yes, I'm at lunch and he comes by and sees
>          me at my desk and asks, "what's going on
>          Roy?"
>
> GEORGE:  Roy, we have heard that you said you got
>          Peter Connell fired.  Did you say this to an
>          associate, yes or no?
>
> SLAY:    I said I think it was my letter that got him
>          fired.
>
> GEORGE:  Did you say you got him fired, yes or no?
>
> SLAY:    So, you had this information when we me[]t
>          earlier today?
>
> GEORGE:  Yes.
>
> SLAY:    No, what I said, "it was probably my letter."
>
> ANDERSON: What letter, was my name in it?
>
> SLAY:    [No reply]
>
> GEORGE:  Ok, Mr. Slay, we wanted to be clear.
>
> SLAY:    Ok.
>
> GEORGE:  You can go.

Timeline at 3.

Around 3:40 p.m., George sent Slay an instant message asking
him to report to George's cubicle. Id. Slay did so and George
led Slay to his predecessor's (Coleman's) office. Id. There
George told Slay that he wanted Slay "to do the right thing and
apologize to [Torres]." Id. Slay agreed to do so. Id. George
then asked, "Are we good?" Id. Slay responded, "We're good!"
Id.

Six days later, on March 9, 2010, George came to Slay's desk
and asked him to sign off his phone for a meeting. Id. Slay
complied, and George escorted him out of the call center and
across the hall to an office where Anderson and George proceeded
to meet with him. Id. George told Slay that they had been
informed by other associates in the call center that he had made
threats against the management team. Id. George identified the
associates as Michael Banuchi ("Banuchi") and Stephen Silva and
stated that Banuchi had said "You said Marylou is next." Id.
Slay replied, "Yes!" Id. Slay then continued:

> I interviewed for one of the two new positions she has.
> When I called Advise and Counsel to make a complaint
> about Will Torres, I told her about him giving me a post-
> it note with the name of an attorney he has done real
> estate business with. He informed me that the attorney
> would give me a kick back for any business I brought him.
> The Advise and Counsel associate then asked me if I was
> a realtor. I replied, "Yes!" She then stated, "You are
> actively practicing real estate right now?" I replied,
> "Yes!" She then stated that this was a conflict of
> interest for the bank, but let me let you get back to why
> you called, I want to talk to you further about you being

11

a realtor, this was going to cause a problem.
Timeline at 3-4.[11]

Anderson replied that being a realtor was not a problem.
Id. at 4.  George then stated, "Roy, I am not stupid!  Don't sit
here and sugar coat what you said.  You pointed to Dave's office
and said, 'you see, he's not here today.'"  Id.  Slay replied,
"Yes, because of my call to Advise and Counsel."  Id.  George
then announced, "At this point, we can't have you making threats
against management.  We are releasing you from your assignment.
Anything you want to say to Dave [Anderson]?"  Id.  Slay replied,
"No!"  Id.

George told Slay that they could not allow him to return to
the call center and asked him if there was anything there that he
needed in order to get home.  Id.  Slay answered that he needed
his portfolio.  Id.  George retrieved it and told Slay that his
other belongings would be boxed and that Slay could pick them up
later.  Id.  George and Anderson then walked Slay out of the
building.  Timeline at 3-4  The following day Slay returned for
his personal belongings.  Id. at 4.  He was given a box, but
later when he opened it he found that it did not include all of
his personal belongings.  Id. at 5.

--------------------------------------------------

[11] The Court has reproduced verbatim Slay's response to George's
statement that "you said Marylou is next."  Timeline at 3.  The Court
has done so because Slay's response immediately preceded his
termination.  See id. at 4.

Slay applied for unemployment insurance benefits, but he was denied because of a form which BOA provided to the DLT. Complaint at 2; Notice of Response. In a May 4, 2010, Notice of Response, a representative of BOA's agent, Ernst & Young, stated that Slay "was discharged for dishonesty on 03/09/2010."[12] Notice of Response. The Notice of Response also directed the reader to an attachment which stated in part that:

> Associate threatened to have senior management fired to his fellow peers. Threats were unfounded and unnecessary. When Roy was confronted with these allegations[,] he admitted to saying this but provided no reason for his comments. Associate had also taken responsibility for the termination of a previous leader (Peter Connell) and that was not the case.

Notice of Response, Attachment ("Att.") at 2.

Another DLT document includes a section which is entitled "[EM]PLOYER STATEMENT." DLT Form.[13] The section was initially completed on "04/30/10" and changed on "05/06/10." DLT Form. It states in part:

> Per documentation provided by Nathan Vinson @ E&Y: [Slay's] last day of work was 3/9/10. He was terminated because of his dishonesty and unprofessional conduct. On that day, the clmt threatened to have a senior management member fired, to his fellow peers. The threats were unfounded and unnecessary. When he was confronted about these allegations, he admitted to saying this but

---

[12] The Notice of Response to Claim ("Notice of Response") advised that: "Effective 01/01/2010, Ernst & Young became the authorized agent for Bank of America in the matters of all [unemployment insurance] [i]ssues." Notice of Response.

[13] This two page DLT document has no apparent title. The top line reads: "DLT480   SSN: [XXX]-[XX]-[XXXX]   Case: 1022840-00   Name: ROY SLAY." The Court refers to this document as DLT Form.

provided no reason for his comments. The clmt had also claimed responsibility for the termination of a previous leader (Peter Connell) and that was [not] the case. The clmt made his r[ema]rks out on the floor in front of co-[wor]kers Rose LePage, Michael Banu[chi], Stephen Vermette. The clmt's actions were a violation of the company's Code of Ethics-policy and professional conduct policy. The Code of Ethics is taken electronically on a yearly basis by every employee at the bank. The clmt had been warned about unprofessional conduct and informed that continuation of this type of behavior could result in termination.

DLT Form at 1-2.[14]

In a decision dated May 7, 2010, the DLT denied Slay's application for unemployment benefits. Claimant Decision ("Decision"). The Decision stated in part:

You were terminated due to your unprofessional conduct in the workplace.

The issue is whether you were discharged for dis-qualifying reasons under Section 28-44-18 of the Rhode Island Employment Security Act.

You were terminated for disqualifying reasons since your actions were not in the employer's best interests. You are denied benefits ....

Id. The Decision advised Slay of his right to appeal, id., and in a May 13, 2010, letter he appealed this adverse determination.

## III. Travel

Slay filed his Complaint in the Providence County Superior Court on September 1, 2010. See Complaint. On October 4, 2010,

---

[14] Words or letters appearing in brackets in the quotation are obscured in the original document filed with the Court. However, their presence can be reasonably inferred from the context and other documents which the Court treats as being integrated or incorporated into the Complaint.

14

BOA removed the action to this Court.  <u>See</u> Dkt.  The instant

Motion to Dismiss was filed on October 12, 2010.  <u>See</u> <u>id.</u>  Slay

filed a response to the Motion on October 27, 2010, <u>see</u>

Plaintiff's Motion to Reinstate Defendant's [sic] Complaint (Dkt.

#7), and the Court treated this response as an objection to the

Motion.

  A hearing on the Motion was held on November 17, 2010,

before Magistrate Judge Lincoln D. Almond.  <u>See</u> Dkt.  During the

hearing, Judge Almond disclosed that prior to his appointment as

a magistrate judge he had been employed by the predecessor to the

law firm which represents BOA in this action.  <u>See</u> Petition

Disqualification of Judge-for Interest (Dkt. #12).  On November

18, 2010, Slay moved to disqualify Judge Almond because of this

relationship and requested that another judge be designated to

hear and decide the action.  <u>See</u> <u>id.</u>

  On November 23, 2010, Judge Almond granted Slay's request in

a text order which stated:

> Although I have no interest whatsoever in this case as
> alleged by Plaintiff and complete confidence in my
> ability to continue to preside impartially over any
> motions referred to me in this case, I shall disqualify
> myself from further participation in this case pursuant
> to 28 U.S.C. § 455(a).  I do so out of an abundance of
> caution and in deference to Plaintiff's pro se status and
> his objectively reasonable, but unfounded, concern as to
> my prior relationship with the predecessor to the law
> firm representing Defendant.

Text Order of 11/23/10.

  The following day, District Judge William E. Smith, who was

formerly employed by the same law firm, recused himself, <u>see</u> Order of Recusal (Dkt. #13), and the case was reassigned to Chief Judge Mary M. Lisi for all further proceedings, <u>see</u> Dkt. On November 29, 2010, the instant Motion to Dismiss was referred to this Magistrate Judge. <u>See</u> <u>id.</u> After listening to the recording of the November 17, 2010, hearing, I concluded that no further hearing on the Motion was necessary and took the matter under advisement.

## IV. Law

### A. Pro Se Status

Slay is proceeding pro se, and his Complaint is held to a less stringent standard than one drafted by a lawyer. <u>See</u> <u>Haines v. Kerner</u>, 404 U.S. 519, 520, 92 S.Ct. 594 (1972). It is to be "read ... with an extra degree of solicitude." <u>Rodi v. Ventetuolo</u>, 941 F.2d 22, 23 (1st Cir. 1991); <u>see also</u> <u>United States v. Genao</u>, 281 F.3d 305, 313 (1st Cir. 2002)("[C]ourts should read pro se complaints less strictly than lawyer-drafted pleadings"). The Court is required to liberally construe a pro se complaint. <u>See</u> <u>Strahan v. Coxe</u>, 127 F.3d 155, 158 n.1 (1st Cir. 1997); <u>Watson v. Caton</u>, 984 F.2d 537, 539 (1st Cir. 1993). At the same time, a plaintiff's pro se status does not excuse him from complying with procedural rules. <u>See</u> <u>Instituto de Educacion Universal Corp. v. U.S. Dep't of Educ.</u>, 209 F.3d 18, 24 n.4 (1st Cir. 2000).

The First Circuit summarized the above law in <u>Dutil v. Murphy</u>, 550 F.3d 154 (1st Cir. 2008).  "[A]s a general rule, we are solicitous of the obstacles that pro se litigants face, and while such litigants are not exempt from procedural rules, we hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects."  <u>Id.</u> at 158 (citing <u>Boivin v. Black</u>, 225 F.3d 36, 43 (1st Cir. 2000)(citing <u>Haines</u>, 404 U.S. at 520); <u>Instituto de Educacion Universal Corp.</u>, 209 F.3d at 23)).

**B.  Applicability of Fed. R. Civ. P. 12(b)(6) Standard**

The Court is cognizant that this case was removed from state court by Defendant and that Rhode Island has not yet explicitly adopted the refined pleading standard announced by the Supreme Court in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 559, 127 S.Ct. 1955 (2007), and further clarified in <u>Ashcroft v. Iqbal</u>, 556 U.S. ___, 129 S.Ct. 1937, 1953 (2009).  Nevertheless, to the extent that Slay may contend that this Court should not apply a federal pleading standard to his Complaint which he drafted for the state superior court, such argument is rejected.  <u>See</u> <u>Norman v. Elkhart Police Dep't</u>, Cause No. 3:10-CV-168-TLS, 2010 WL 1996604, at *1 (N.D. Ind. May 17, 2010)(applying Rule 12(b)(6) standard as articulated in <u>Twombly</u> and <u>Iqbal</u> to pro se plaintiff's complaint which had been removed from state court to

federal court); see also Cleary v. Boston Scientific Corp., No.
CV06-3423(BMC)(MLO), 2006 WL 2689815, at *3 (E.D.N.Y. Sept. 18,
2006)("[I]t is commonplace for claims to fail as a mater of law
in federal court, and for that to be apparent to the court at the
outset.  Removed cases are no different."); cf. Council Tower
Ass'n v. Axis Specialty Ins. Co., ___ F.3d ___, 2011 WL 31519, at
*4 (8th Cir. Jan. 6, 2011)("applying federal pleading standards
and Missouri substantive law" in reviewing grant of summary
judgment where defendants had removed case to federal court).

Moreover, even if this Court were to apply the arguably
somewhat more liberal Rhode Island pleading standard, see
Barrette v. Yakavonis, 966 A.2d 1231, 1233-34 (R.I. 2009)(stating
Rule 12(b)(6) standard under Rhode Island law); Tucker Estates
Charlestown, LLC v. Town of Charlestown, 964 A.2d 1138, 1140
(R.I. 2009)(same), the Court's judgment regarding the instant
Motion would be the same.  For the sake of absolute clarity on
this point, the Court states that it has examined the Complaint
to determine if Slay is "entitled to relief under any conceivable
set of facts," Tucker Estates Charlestown, LLC, 964 A.2d at 1140,
and that after doing so "it is clear beyond a reasonable doubt,"
id., that he is "not ... entitled to relief under any set of
facts that could be proved to support the claim," id.;[15] cf.

---

[15] The standard recited in Tucker Estates Charlestown, LLC v. Town
of Charlestown, 964 A.2d 1138 (R.I. 2009), with its references to
"beyond a reasonable doubt," id. at 1140, and to "any set of facts,"

18

<u>Dellefratte v. Estate of Dellefratte</u>, 941 A.2d 797, 798 (R.I. 2007)("A viable complaint must give the opposing party fair and adequate notice of the type of claim being asserted, even if it does not plead the ultimate facts or precise legal theory on which the claim is based.")(interpreting Rule 8(a) of the Superior Court Rules of Civil Procedure)(internal quotation marks omitted).

### C. Rule 12(b)(6) Standard

In 2007, the Supreme Court altered the Rule 12(b)(6) standard in a manner which gives it more heft. <u>ACA Fin. Guar. Corp. v. Advest, Inc.</u>, 512 F.3d 46, 58 (1st Cir. 2008). In order to survive a motion to dismiss a complaint must allege 'a plausible entitlement to relief." <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 559). This pleading standard applies to all civil actions. <u>Iqbal</u>, 129 S.Ct. at 1953.

---

<u>id.</u>, closely parallels the now outdated language in <u>Conley v. Gibson</u>, 355 U.S. 41, 78 S.Ct. 99 (1957). In <u>Conley</u>, the United States Supreme Court referred to "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Id.</u> at 45-46. However, this standard was abandoned by the Supreme Court in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S.Ct. 1955 (2007). <u>See</u> <u>Twombly</u>, 550 U.S. at 562-63 ("<u>Conley</u>'s no set of facts language has been questioned, criticized, and explained away long enough. ... The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.")(internal quotation marks omitted). Thus, what makes Rhode Island's pleading standard somewhat more liberal than its federal counterpart is the fact that Rhode Island has not yet followed <u>Twombly</u> and abandoned the <u>Conley</u>-like language quoted above from <u>Tucker Estates Charlestown, LLC</u>.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." <u>Iqbal</u>, 129 S.Ct. at 1949 (quoting Fed. R. Civ. P. 8(a)(2)). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 555). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 557).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 570); <u>see also</u> <u>Sepúlveda-Villarini</u>, 628 F.3d 25, 29 (1st Cir. 2010)("The make-or-break standard ... is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief.")(citing <u>Iqbal</u>, 129 S.Ct. at 1950-51). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. <u>Id.</u> (citing <u>Iqbal</u>, 129 S.Ct. at 1949). The plausibility standard is not akin to a "probability requirement,"

id., but it asks for more than a sheer possibility that a defendant has acted unlawfully, id. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 557).

In Iqbal, the Supreme Court explained that two working principles underlay its decision in Twombly. Id. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Id. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Id. (citing Twombly, 550 U.S. at 555). Thus, although for the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1949-50. While Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Id. at 1950. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Id. (citing Twombly, 550 U.S. at 556). Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense.  Id.
Where the well-pleaded facts do not permit the court to infer
more than the mere possibility of misconduct, the complaint has
alleged-but it has not "show[n]"-"that the pleader is entitled to
relief."  Id. (quoting Fed. R. Civ. P. 8(a)(2)).  At the same
time, "Twombly cautioned against thinking of plausibility as a
standard of likely success on the merits; the standard is
plausibility assuming the pleaded facts to be true and read in a
plaintiff's favor."  Sepúlveda-Villarini, 628 F.3d at 30.

A court considering a motion to dismiss can choose to begin
by identifying pleadings that, because they are no more than
conclusions, are not entitled to the assumption of truth.  Iqbal,
129 S.Ct. at 1950.  While legal conclusions can provide the
framework of a complaint, they must be supported by factual
allegations.  Id.  When there are well-pleaded factual
allegations, a court should assume their veracity and then
determine whether they plausibly give rise to an entitlement to
relief.  Id.  The Iqbal court cited its analysis in Twombly as
illustrative of this "two-pronged approach."  Id.

**V.  Discussion**

Read generously, Slay's Complaint appears to assert claims
against BOA for (1) violation of the First, Fourth, Fifth, and
Ninth Amendments to the United States Constitution; (2)
intentional infliction of emotional distress; (3) violation of

the Rhode Island Fair Employment Practices Act ("RIFEPA");[16] (4) violation of state and federal whistleblower protection statutes; (5) defamation; and (6) violation of unspecified rights. See Complaint. The Court considers each of these claims.

**A. Claims Based on Alleged Violations of Constitutional Amendments**

Slay alleges that BOA and its employees violated his rights under the First, Fourth, Fifth, and Ninth Amendments to the United States Constitution. See Complaint at 3. However, these Amendments limit the powers of the government, not private persons. See Lawson v. Liburdi, 114 F.Supp.2d 31, 37 (D.R.I. 2000)("The Bill of Rights of the United States Constitution limits the powers of the federal government and not private persons."); see also Lefkowitz v. Brooks, 436 U.S. 149, 156, 98 S.Ct. 1729 (1978)("[M]ost rights secured by the Constitution are protected only against infringement by governments."); Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7, 570 F.3d

---

[16] BOA states that Slay appears to assert a claim for "violation of the Rhode Island Civil Rights Act ("RICRA")." Defendant's Mem. at 1; see also id. at 8 (arguing that the Complaint fails to state a claim for violation of the RICRA). However, the statute which BOA cites in connection with its argument, R.I. Gen. Laws § 28-5-7(4), id. at 8, is not part of the RICRA but part of the Rhode Island Fair Employment Practices Act ("RIFEPA"). The RICRA, R.I. Gen. Laws § 42-112-1 et seq., and the RIFEPA, R.I. Gen. § 28-5-1 et seq., are separate statutes. See Malone v. Lockheed Martin Corp., 610 F.3d 16, 18 (1st Cir. 2010)(identifying them as such). The RICRA prohibits discrimination based on race, color, religion, sex, disability, age or country of ancestral origin. See R.I. Gen. Laws § 42-112-1. Slay has made no allegation of discrimination in his Complaint, and the RICRA is inapplicable.

811, 815 (7th Cir. 2009)("The First and Fourteenth Amendments to the Constitution protect citizens from conduct by the government, but not from conduct by private actors, no matter how egregious that conduct might be."); <u>Wingate v. Gage Cnty. Sch. Dist., No. 34</u>, 528 F.3d 1074, 1080 (8th Cir. 2008)(stating that the First Amendment's "constitutional guarantee ... only extends to protect citizens from government actions"); <u>Dixon v. Coburg Dairy, Inc.</u>, 369 F.3d 811, 819 (4th Cir. 2004)("Congress has ... notably refrained from extending free speech rights to the private work force."); <u>In re Providence Journal Co.</u>, 820 F.2d 1342, 1350 (1st Cir. 1986)("The Fourth Amendment protects citizens from abuses by the government, not from the actions of private parties.") (footnotes omitted); <u>Rzayeva v. United States</u>, 492 F.Supp.2d 60, 80 (D. Conn. 2007)("the Fourth, Fifth, and Ninth Amendments are wholly inapplicable to private conduct"); <u>cf.</u> <u>United States v. Mendez-de Jesus</u>, 85 F.3d 1, 2-3 (1st Cir. 1996)("In the absence of governmental action, the Fourth Amendment does not apply."); <u>Rosario v. United States</u>, 538 F.Supp.2d 480, 494 n.10 (D.P.R. 2008)("It is axiomatic that the U.S. Constitution protects only against government action.").

BOA is a private actor, and the amendments which Slay cites provide no protection against conduct by a private actor. Accordingly, to the extent that Slay's claims are based on alleged violations of the First, Fourth, Fifth, and Ninth

Amendments, his Complaint fails to state a claim upon which relief can be granted. Such claims are not viable, and they should be dismissed. I so recommend.

**B. Claim for Intentional Infliction of Emotional Distress**

Although Slay does not use the phrase "intentional infliction of emotional distress" in his Complaint, construing his pro se pleading generously, such a claim can be reasonably inferred. However, this claim is barred because the Rhode Island Workers' Compensation Act ("WCA") provides the exclusive remedy for employees who have suffered intentional infliction of emotional distress in connection with their employment. See Iacampo v. Hasbro, Inc., 929 F.Supp. 562, 582 (D.R.I. 1996)("the WCA provides the exclusive remedy for claims against employers by employees who have suffered intentional infliction of emotional distress in the workplace"); see also id. at 581-82 ("The scope and breadth of the WCA is not to be underestimated; the Act establishes a statutory scheme whereby a employee will be provided with swift, though limited, relief for all injuries suffered on the job. 'However, the right to no-fault compensation from one's employer is afforded in lieu of all other rights and remedies that an injured employee might have[.]'") (quoting DiQuinzio v. Panciera Lease Co., Inc., 612 A.2d 40, 42 (R.I. 1992))(alteration in original). The Court reaches this conclusion because there is nothing in the record to suggest that

Slay was not covered by the WCA and it is clear that his claimed injury was related to the workplace. Cf. id. at 582 (stating that to defeat dismissal of claim for intentional infliction of emotional distress plaintiff "must show either that she is not subject to the WCA, or that the emotional distress she suffered was unrelated to the workplace"). As BOA accurately notes, Slay does not allege that BOA harmed him in any capacity other than as his employer.

To the extent that Slay may contend that at least some of the intentional infliction of emotional distress about which he complains is the result of his termination and that he was not employed by BOA at that time and, thus, not covered by the WCA, such contention is rejected. In Censullo v. Brenka Video, Inc., 989 F.2d 40 (1st Cir. 1993), the First Circuit held that an exclusivity provision in the New Hampshire Workers' Compensation Act (which is parallel to the exclusivity provision of the Rhode Island WCA) barred the employee's claim for emotional distress arising out of his discharge. See id. at 43 ("The district court correctly found that the workmen's compensation statute bars employees from suing their employers for personal injuries arising out of the employment relationship.").

Accordingly, because the WCA provides the exclusive remedy for Slay's claim of intentional infliction of emotional distress, to the extent that such claim is alleged in the Complaint, this

cause of action is barred.  Accordingly, the Motion should be

granted with respect to it.  I so recommend.[17]

### C.  Claim for Violation of RIFEPA

Slay alleges that after he was hired BOA asked him to complete

a new hire questionnaire and that some of the questions were of a

personal nature, including one relating to his sexual

orientation.  Complaint at 2.  He alleges that this was a

violation of Rhode Island state law, id., but he has not

identified any particular statute.  After consideration, the

Court concludes that the statute most likely applicable to this

claim is the RIFEPA, R.I. Gen. Laws § 28-5-1 et seq.,[18]  However,

---

[17] BOA also argues that any claim for intentional infliction of
emotional distress must be dismissed for the additional reason that
the Complaint fails to plead facts plausibly establishing his
entitlement to relief.  See Defendant's Mem. at 6.  Specifically, BOA
contends that Slay has not pled facts to plausibly establish: (1)
intentional or reckless conduct; (2) conduct that is extreme or
outrageous; (3) a causal connection between the conduct and the
emotional distress; (4) severe emotional distress; and (5) "at least
some proof of medically established physical symptomatology."  Id.
(quoting Swerdlick v. Koch, 721 A.2d 849, 863 (R.I. 1998)).  The Court
finds it unnecessary to reach this argument as it is satisfied that
the claim is barred by the exclusivity provisions of the WCA.

[18] Section 28-5-7 of the RIFEPA provides in relevant part:

It shall be an unlawful employment practice:

....

(4) Except where based on a bona fide occupational
qualification certified by the commission or where necessary
to comply with any federal mandated affirmative action
programs, for any employer or employment agency, labor
organization, placement service, training school or center, or
any other employee referring source, **prior to employment** or
admission to membership of any individual, to:

27

the RIFEPA only prohibits an employer from seeking certain information "prior to employment," § 28-5-7(4). It does not prohibit an employer from requesting this information after an employee has been hired. Accordingly, to the extent that Slay's Complaint is based on BOA's request that he complete the new hire questionnaire, it fails to state a claim upon which relief can be granted. BOA's Motion to Dismiss such claim should be granted. I so recommend.

**D. Claim for Violation of Whistleblower Protection Statutes**

Slay does not identify any whistleblower statute in his Complaint which he alleges has been violated. Indeed, the term "whistleblower" does not appear in the Complaint. The Court infers that he is making a claim based on a whistleblower statute from his allegations that BOA is a financial institution, that it must adhere to federal, state, and international regulations, that the protection of customer information has been compromised, and that he pointed this out by providing a copy of Coleman's Email to DBR-DB, see Complaint at 3-4, plus the statement in his letter to DBR-DB (which letter the Complaint specifically

---

(I) Elicit or attempt to elicit any information directly or indirectly pertaining to his or her race or color, religion, sex, sexual orientation, gender identity or expression, disability, age, or country of ancestral origin;

....

R.I. Gen. Laws § 28-5-7(4) (bold added).

references, <u>see</u> Complaint at 2) that he "want[s] [his] job protected and Whistle Blower status," Letter from Slay to DBR-DB of 11/11/09.

## 1. Rhode Island Whistleblowers' Protection Act

Slay does not cite any state whistleblower statute.[19]  The Court will assume that he contends BOA harassed and terminated him in violation of the Rhode Island Whistleblowers' Protection Act, R.I. Gen. Laws § 28-50-3, because he reported an information security breach at BOA to DBR-DB.  <u>See</u> Complaint 1-3.  An employee is only protected under the Whistleblowers' Protection Act, however, when he reports or is about to report to a public body, to his employer, or to his supervisor "a violation which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the law of this state, a political subdivision of this state, or the United States ...."  R.I. Gen, Laws § 28-50-3(1), (4).[20]  BOA

_____

[19] Among the fifty pages of documents Slay filed with his Complaint are two which appear to have been obtained from the internet.  One bears the heading "Rhode Island State Security Breach Laws," but it contains no statutory citations.  The Court's research failed to locate a state statute arguably applicable to the facts alleged by Slay other than the Rhode Island Whistleblowers' Protection Act.  Accordingly, it is discussed above.  The other document bears the heading "The Gramm-Leach Bliley Act," and that statute is addressed in the following section.

[20]  The Rhode Island Whistleblowers' Protection Act, R.I. Gen. Laws § 28-50-3, provides in relevant part:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of

contends that Slay has failed to plead a valid claim under the Whistleblowers' Protection Act because the Complaint does not allege that BOA violated any federal, state, or local law or regulation. See Memorandum in Support of Defendant's Motion to Dismiss Plaintiff's Complaint ("Defendant's Mem.") at 9. The Court agrees.

Slay's allegations fall far short of plausibly establishing that the email communication which Slay reported to DBR-DB constituted a violation of federal, state, or local law. The email asked Slay to provide his "computer name." Coleman's Email. Slay does not identify any statute or regulation which

---

employment:

(1) Because the employee, or a person acting on behalf of the employee, reports or is about to report to a public body, verbally or in writing, a violation which the employee knows or reasonably believes has occurred or is about to occur, **of a law or regulation or rule promulgated under the law of this state, a political subdivision of this state, or the United States**, unless the employee knows or has reason to know that the report is false, or

....

(4) Because the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee **knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the laws of this state, a political subdivision of this state, or the United States,** unless the employee knows or has reason to know that the report is false. Provided, that if the report is verbally made, the employee must establish by clear and convincing evidence that the report was made.

R.I. Gen. Laws § 28-50-3 (bold added).

this email violated.  Slay also fails to allege facts which would plausibly establish that he "reasonably believe[d] [a violation] ha[d] occurred or [was] about to occur ...."  R.I. Gen. Laws § 28-50-3.  His assertion that the email was an "Information Security Breach," Letter from Slay to Lewis of 9/28/09, is a conclusion which is not sufficient to give Slay's pleading "facial plausibility."  Iqbal, 129 S.Ct. at 1949 ("A pleading which offers 'labels and conclusions' ... will not do."); id. at 1950 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); see also id. ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]"–"that the pleader is entitled to relief.").

To be plain, Slay must allege sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Id. at 1949.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  Slay has failed to allege facts that allow the Court to draw the reasonable inference that the email violated a federal or state statute or regulation.  He merely asserts that it constituted an information security breach without explaining how the email violated any law or regulation.

Slay has also failed to allege facts which would support a reasonable inference that his November 11, 2009, letter to DBR-DB, which was forwarded to the Comptroller of the Currency, was causally connected to his termination.  Slay suggests that his satisfactory performance reviews and the fact that he did not receive a verbal or written warning prior to his termination support the conclusion that the letter and his firing are causally connected.  However, given the egregiousness of the conduct to which Slay admitted to his superiors on March 9, 2010, the Court is unable to find that it can be reasonably inferred that Slay's letter and his termination are connected.  Cf. Iqbal, 129 S.Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Accordingly, Slay's allegations, even when read generously, fail to allege plausibly a violation of R.I. Gen. Laws § 28-50-3. See id. at 1951 (explaining that allegations of complaint are to be examined "to determine if they plausibly suggest an entitlement to relief"); Sepúlveda-Villarini, 628 F.3d at 29 ("The make-or-break standard ... is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief.").  His Complaint fails to state a plausible claim under the Rhode Island Whistleblowers' Protection

Act.  Any claim based on that statute should be dismissed.  I so recommend.

## 2.  The Gramm-Leach Bliley Act

As previously noted,[21] Slay filed a document which provides some information about the Gramm-Leach Bliley Act ("GLBA") although no statutory citation.  The GLBA, 15 U.S.C. § 6801 et seq., requires financial institutions to protect the security and confidentiality of their customers' nonpublic personal information.  See RQ Constr., Inc. v. Ecolite Concrete U.S.A., Inc., Civil No. 09-CV-2728-BEN(WVG), 2010 WL 3069198, at *2 (S.D. Cal. Aug. 4, 2010).[22]  To the extent that Slay may contend that it is the Court's task to identify a specific provision of the GLBA that Coleman's Email violated, such contention is rejected. Cf. B.D. v. Griggs, Civil Case No. 1:09cv439, 2010 WL 2775841, at *7 (W.D.N.C. July 13, 2010)("[T]he Court is not obligated, even for a *pro se* litigant, to comb through volumes of documents searching for claims.").

Moreover, separate and apart from Slay's failure to identify

---

[21] See n.19.

[22] The Gramm-Leach Bliley Act ("GLBA") does not provide a private right of action for an alleged violation.  See Dunmire v. Morgan Stanley DW, Inc., 475 F.3d 956, 960 (8th Cir. 2007); In re Davis, 430 B.R. 902, 908 (D. Colo. 2010)("there is no private right of action under the Gramm-Leach-Bliley Act"); Vinton v. Certegy Check Servs., Inc., No. 1:08-cv-881, 2009 WL 2777095, at *2 (W.D. Mich. Aug. 31, 2009)("[b]y its very terms, the Gramm-Leach-Bliley Act does not provide a private right of action")(quoting In re French, 401 B.R. 295, 310 (E.D. Tenn. 2009))(alteration in original).

a provision of the GLBA which BOA violated, any federal whistleblower claim fails for the same reasons that his Rhode Island whistleblowers' claim fails. He has failed to allege facts that would allow the Court to draw the reasonable inference that the email violated the GLBA. Slay has also failed to allege facts which would support a reasonable inference that his letter to the DBR-DB was causally connected to his termination. Thus, any claim based on the GLBA should be dismissed. I so recommend.

### E. Defamation Claims

Slay states that he seeks $25 million in damages for "defamation of [his] character ...." Complaint at 3. He does not specifically identify what statements or acts by BOA constitute the defamation. See Complaint. In the Complaint he states that management "made false accusations that I threaten[ed] a manager (Marylou Gervasio) and the quality assurance coach (Will Torres)," id. at 1, and also "accuse[d] me of threatening to have a senior management member fired to my fellow peers," id. at 3. Slay additionally alleges that his unemployment insurance was denied because of the "Employer Statement from Bank of America." Id. at 2.

### 1. Threats

BOA focuses on the first two statements quoted above and argues that the Complaint does not state a viable defamation claim based on them. See Defendant's Mem. at 10. In particular,

BOA argues that Slay has failed to allege facts sufficient to satisfy the first, third, and fourth elements of a defamation claim under Rhode Island law.  See id.  Those elements are "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) damages unless the statement is actionable irrespective of special harm." Chrabaszcz v. Johnston Sch. Comm., 474 F.Supp.2d 298, 317 (D.R.I. 2007)(citing Healey v. New England Newspapers, Inc., 555 A.2d 321, 324 (R.I. 1989)).

In analyzing this claim, the Court focuses first on whether any of the allegedly defamatory statements were published to a third party because without such publication there can be no defamation.  See id.  The only publication to a third party which can be reasonably inferred from the Complaint are the communications which BOA made to the DLT.  Thus, to the extent that Slay's defamation claim is based on any statement not reflected in those communications, the Complaint fails to state a claim upon which relief can be granted.

With respect to the communications sent to the DLT from BOA, the statements that Slay "threatened to have senior management fired to his fellow peers," Notice of Response, Att. at 2; DLT Form at 1 (same), and that he took "responsibility for the termination of a previous leader (Peter Connell)," Notice of

35

Response, Att. at 2; DLT Form at 1-2 (same), cannot be deemed to be false in light of Slay's admissions in his own pleadings. Slay admits that he told another employee that "it was probably my letter," Timeline at 3, that got Peter Connell fired, see id.[23] He also admits that when he was asked by George whether he said to Banuchi that "Marylou is next," id., he replied, "Yes!" id. Slay further admits that he "pointed to Dave's office and said, 'you see he's not here today.'" Id. at 4. While Slay apparently believes that he was not threatening anyone in making these statements, BOA could reasonably interpret them as being "threaten[ing]," Notice of Response, Att. at 2. Thus, Slay cannot establish that BOA's statements to the DLT that he "threatened to have senior management fired to his fellow peers," id., and that he took "responsibility for the termination of a previous leader," id., are false. To the extent that his defamation claim is based on these statements concerning threats, the Complaint fails to state a claim upon which relief can be granted.

## 2. Dishonesty

A closer question is presented with respect to the

---

[23] The conversation in which Slay admits to making this statement begins with George telling him that "Will Torres said you threaten[ed] him." Timeline at 3. Later in the afternoon, George tells Slay that he wants Slay to apologize to Torres, and Slay agrees to do so. See id. It is a reasonable inference that George wanted Slay to apologize to Torres for making a statement which Torres interpreted as a threat.

statements that Slay was discharged for "dishonesty." In the
Notice of Response, BOA's representative wrote that: "The
claimant was discharged for dishonesty on 03/09/2010." Notice of
Response. Beneath this typed statement is a handwritten notation
which states "see attached."[24] Id. The referenced attachment
contains the explanation which is quoted in full on page 13 of
this Report and Recommendation. See Section II. Facts supra at
13. The statement that Slay was discharged for "dishonesty" also
appears in the DLT Form. See id. ("He was terminated because of
his dishonesty and unprofessional conduct.")(quoting DLT Form at
1-2).

        The only apparent basis BOA could have for making the
statement that Slay was discharged for "dishonesty" is that he
took "responsibility for the termination of a previous leader
(Peter Connell) and that was not the case." Notice of Response,
Att. at 2; see also DLT Form at 1. However, Slay admitted to
stating that it was "probably" his letter that got Connell fired.
Timeline at 3. Therefore, he was not dishonest about the fact
that he made the statement. Indeed, he took responsibility for
his actions.

---

[24] It bears noting that the Notice of Response filed by Slay is a
photocopy and that a portion of the original document appears to have
been blocked out in some manner, resulting in approximately one inch
of white space in the body of the document. It is in this space that
the handwritten notation "see attached" appears. The Court does not
speculate as to the content of the blocked-out portion of the Notice
of Response and considers the document as it appears in Slay's
pleadings.

Thus, the sole basis for BOA's statement that Slay was discharged for "dishonesty" would appear to be BOA's subjective belief that it was dishonest of Slay to state that he caused Connell's firing when BOA knew that was not the case. This is not enough for the Court to find that these statements in the Notice of Response and DLT Form were not false. Accordingly, as to these statements, I find that Slay has adequately pled facts establishing that the statements were false.

BOA presumably contends that even if the statements are false, they are not defamatory. A statement is defamatory if it is false and malicious and "imput[es] conduct which injuriously affects a man['']s reputation, or which tends to degrade him in society or bring him into public hatred and contempt[.]" <u>Marcil v. Kells</u>, 936 A.2d 208, 212 (R.I. 2007). "Whether the meaning of a particular communication is defamatory is a question of law for the court to decide rather than a factual issue for a jury to determine." <u>Id.</u> at 213. "[T]he decisive question is what the person or persons to whom the communication was published reasonably understood as the meaning intended to be expressed." <u>Id.</u> (quoting Restatement (Second) Torts § 563 cmt. e. at 164 (1977))(alteration in original).

BOA presumably would argue that anyone at the DLT who read the Notice of Response (and the attachment) and the DLT Form would reasonably understand that BOA did not mean that Slay was

discharged for stealing or lying, but rather because he threatened to have senior management fired and took responsibility for the termination of a previous leader when that was not the case. While the Court finds this argument persuasive as to the dishonesty sentence in the DLT Form, it is less so with respect to the similar statement in the Notice of Response.

The argument depends on the assumption that everyone who reads the "dishonesty" sentence in each document also reads the other sentences which explain its intended meaning. With respect to the DLT Form, such reading is almost unavoidable because the explanatory sentences immediately follow the "dishonesty" sentence. See DLT Form. Thus, the allegedly defamatory statement and the explanation as to what BOA meant by the "dishonesty" sentence are all within the same document, on the same page, and in the same section. In contrast, the explanatory information for the "dishonesty" sentence which appears in the Notice of Response is located in the attachment. It is relatively easy to read the "dishonesty" sentence in the Notice of Response without seeing BOA's explanation as to what it meant by this statement. While it is unclear from the present record how many pages separated the "dishonesty" sentence from BOA's explanation of its meaning,[25] the Court attaches significance to

_____

[25] The Notice of Response (which contains the "dishonesty" sentence) has a fax transmission heading at the top which indicates that it is "P002/007." Notice of Response. The page of the

the fact that it is necessary to refer to another document to understand BOA's intended meaning in the Notice of Response. Without that explanation any person at the DLT who read only the Notice of Response could reasonably have understood the "dishonesty" sentence to mean that Slay was discharged for stealing or lying.

The Court is satisfied that when a bank states that an employee was discharged for "dishonesty" it "impute[s] conduct which injuriously affects [his] reputation, or which tends to degrade him in society ...." Marcil, 936 A.2d at 212; see also Alves v. Hometown Newspapers, Inc., 857 A.2d 743, 750-51 (R.I. 2004)("When considering whether a statement or conduct is defamatory, the court must take into account 'the context of the statement in which the publication occurs and the plain and ordinary meaning of the words in the community in which the publication occurred.")(internal quotation marks omitted).

BOA may argue that the "dishonesty" sentence was opinion. Rhode Island has "adopted the doctrine that a statement in the form of an opinion may be defamatory and therefore actionable if and only if 'it implies the allegation of undisclosed defamatory facts as the basis for the opinion.'" Healey v. New England Newspapers, Inc., 555 A.2d 321, 324 (R.I. 1989). Applying this

attachment which contains BOA's explanatory statement has a similar heading: "P005/007." Id., Att. at 2. This suggests a separation of at least two pages.

law to the instant case is not easily done.  The "dishonesty" sentence in the Notice of Response "implies the allegation of undisclosed defamatory facts as the basis for the opinion," id., because no facts explaining the statement are contained in the Notice of Response.  Yet, at the same time the Notice of Response specifically directs the reader to the attachment which discloses the facts on which BOA's opinion is based, and those facts are not defamatory because they are not false.

In the Court's view, the argument that the "dishonesty" sentence in the Notice of Response is opinion could be successful for BOA.  However, the Court is not comfortable finding that Slay's defamation claim based on this statement cannot succeed because of an argument which BOA has yet to make.[26]  Accordingly, to the extent that BOA contends that Slay has failed to allege facts sufficient to support the first element of a defamation claim, such argument is rejected as to the dishonesty sentence contained in the Notice of Response.[27]  Standing by itself

---

[26] BOA's failure to make this argument is understandable.  Slay did not identify the "dishonesty" sentences as a basis for his defamation claim.  The Court has done so only because of the liberal and generous view it has taken of his pleadings.

[27] Although Slay does not identify the "dishonesty" sentence as a basis for his defamation claim, he references the DLT "documentation," Complaint at 2, and that documentation includes the Notice of Response in which the "dishonesty" sentence appears.  He also specifically complains about being denied unemployment insurance.  Id.  While this Court recognizes that it "is not required to search for or try to create causes of action for pro se plaintiffs," Drake v. Principi, Civil Action No. 3:03-cv-284HTW-JCS, 2006 WL 2827702, at *6 (S.D. Miss. Sept. 30, 2006), here the statement that Slay was "discharged

without the explanation provided in the attachment, the statement that "[t]he claimant was discharged for dishonesty on 03/09/2010," Notice of Response, is false and defamatory. However, with regard to all other statements, the Court finds that Slay has failed to allege facts sufficient to support the first element of a defamation claim.

Proceeding to the third and fourth elements of a defamation claim, "fault amounting at least to negligence on the part of the publisher," Chrabaszcz v. Johnston Sch. Comm., 474 F.Supp.2d at 317, and "damages," id., the Court will assume that with respect to the "dishonesty" sentence in the Notice of Response there is fault on the part of BOA which at least amounts to negligence. The Court finds on these facts that it was at least negligent for BOA's agent to write a sentence stating that Slay "was discharged for dishonesty" without ensuring that the circumstances which caused BOA to make this statement were disclosed in the same document and in such a manner that anyone reading the sentence could not help but also read the explanatory statements.

With respect to the element of damages, however, Slay's defamation claim fails. He alleges that he was denied

_____

for dishonesty ...," Notice of Response, and the lack of factual support for that statement is apparent from even a cursory reading of the Complaint and integrated filings, cf. Dutil v. Murphy, 550 F.3d 154, 158 (1st Cir. 2008)("[W]e hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects.").

unemployment benefits because of BOA, but he cannot show that he was denied those benefits because of the statement that he "was discharged for dishonesty." The Decision makes no mention of Slay being terminated for dishonesty. Rather, the Decision is explicit in stating the Slay was "terminated due to your unprofessional conduct in the workplace." It is clear from this statement that the DLT read the explanation in the attachment to the Notice of Response and that the DLT denied Slay's claim based on that information (and not on a mistaken belief that Slay was guilty of theft or lying). As already discussed, Slay admitted to making statements which BOA management reasonably interpreted as being unprofessional and threatening.

The Court understands that Slay disputes that his behavior was unprofessional or threatening. The issue here, however, is whether Slay is able to allege facts which would plausibly show that he was denied unemployment insurance benefits because of the sentence in the Notice of Response that he "was discharged for dishonesty ...." Given that the Decision makes no mention of dishonesty and specifically references his "unprofessional conduct," the Court finds that Slay is unable to allege such facts. Accordingly, Slay's only remaining defamation claim fails, and the Motion should be granted with respect to it. I so recommend.

### 3. Conclusion Re Defamation Claim

To the extent that any defamation claim is based on statements by BOA that Slay made threats, such claim fails because Slay's own admissions demonstrate that such statements were not false.  To the extent any defamation claim is based on statements by BOA that Slay was terminated for "dishonesty," such claim fails with respect to the statement in the DLT Form because the explanation as to what the BOA meant by this statement is almost impossible to ignore, and with that explanation the statement is not defamatory.  To the extent that any defamation claim is based on the similar "dishonesty" sentence in the Notice of Response, Slay is unable to state facts to support a defamation claim based on that statement because he cannot show that he suffered damages as a result of it.  The damages he claims, the denial of unemployment benefits, are clearly attributable to BOA's report of his unprofessional conduct and not to any mistaken belief by the DLT that he had been discharged for theft or lying.[28]

---

[28] Although the issue of privilege is not presented by the instant Motion, it bears noting that it is "well settled in this jurisdiction that '[t]he publisher of an allegedly defamatory statement may avoid liability if he or she is privileged to make the statement in question.'" Kevorkian v. Glass, 913 A.2d 1043, 1048 (R.I. 2007) (quoting Mills v. C.H.I.L.D., Inc., 837 A.2d 714, 720 (R.I. 2003)) (alteration in original).  "[A] qualified privilege exists if the publisher makes the statements in good faith and reasonably believes that he has a legal, moral, or social duty to speak out, or that to speak out is necessary to protect his own interests, or those of third person[s], or certain interests of the public." Id. (internal quotation marks omitted); see also Avilla v. Newport Grand Jai Alai

**F. Other Claims**

To the extent that Slay may contend that he has other claims not addressed above, such contention is rejected. Pursuant to Rule 8 of the Federal Rules of Civil Procedure, a "pleading that states a claim for relief must contain ... a short and plain statement showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The Court has addressed all claims which can be reasonably found in Slay's Complaint and related filings. His statement that he seeks damages for violations of "any rights I am entitle[d] to[] not mention[ed] above," Complaint at 3, fails to state a claim upon which relief can be granted because it fails to give BOA fair notice of what the claim is. See Aponte-Torres v. Univ. of Puerto Rico, 445 F.3d 50, 55 (1st Cir. 2006) (stating that a complaint "must give the defendant[s] fair notice of what the plaintiff[s'] claim is and the grounds upon which it rests")(alterations in original)(internal quotation marks omitted).

The same is true with respect to the vague allegation that his firing was the result of a conspiracy. See Complaint at 1;

---

LLC, 935 A.2d 91,96 (R.I. 2007)(affirming summary judgment on basis that employer had a qualified privilege as to defamation claim arising from statements to players' union that player was not rehired because of his alleged cheating); Kevorkian, 913 A.2d at 1049 (finding former supervisor's statement that former employee had "unacceptable work practice habits" was covered by statutory privilege). Thus, because BOA had a legal duty to respond to the inquiry from the DLT to protect its own interest, there is a strong argument that BOA's statements were privileged.

see also <u>Méndez Internet Mgmt. Servs., Inc. v. Banco Santander de
Puerto Rico</u>, 621 F.3d 10, 15 (1st Cir. 2010)(affirming Rule
12(b)(6) dismissal where complaint stated "only that the
defendants 'entered into a conspiracy to extort the plaintiff'");
<u>Peña-Borrero v. Estremeda</u>, 365 F.3d 7, 11 (1st Cir. 2004)
(agreeing "that the allegations in the complaint directed to
conspiracy are wholly conclusory and inadequate, under any
pleading standard, to support relief"); cf. <u>Read & Lundy, Inc. v.
Washington Trust Co. of Westerly</u>, 840 A.2d 1099, 1102 (R.I. 2004)
("[C]ivil conspiracy is not an independent basis of liability.
It is a means for establishing joint liability for other tortious
conduct; therefore, it requires a valid underlying intentional
tort theory.")(internal quotation marks omitted).  Any hostile
work environment claim based on retaliation fails because Slay is
unable to state a viable claim under any federal or state
whistleblower statute that he has identified with anything
approaching reasonable particularity.

## VI.  Summary

Slay's claim based on alleged violations of the First,
Fourth, Fifth, and Ninth Amendments fails because these
amendments only limit the powers of the government, not private
actors like BOA.  Any claim for intentional infliction of
emotional distress is barred because the WCA is his exclusive
remedy.  Slay has no viable cause of action under RIFEPA based on

the request that he complete the new hire questionnaire because the request was made after he was hired, not before.  Any claim for defamation based on BOA's statements that Slay threatened to have managers fired is barred because Slay's admissions demonstrate that such statements were not false, and, therefore, not defamatory.  To the extent his defamation claim is based on statements that he was discharged for dishonesty, such claim fails because Slay cannot show that he suffered damages as a result of such statement.  Any other claims alleged fail because Slay has failed to plead them in a manner to provide reasonable notice to BOA of what those claims are.

## VII.  Conclusion

For the reasons explained above, I recommend that the Motion to Dismiss be granted.  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).

**/s/ David L. Martin**
DAVID L. MARTIN
United States Magistrate Judge
March 9, 2011